**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00510 (CKK)** |
| v. | : | |
| | : | |
| **JANET WEST BUHLER,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Janet West Buhler ("Buhler") to a split sentence[1] of 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

I.      **Introduction**

The defendant, Buhler, and her stepson-in-law, Michael Lee Hardin ("Hardin") (Case No. 1:21-cr-280 (TJK)),[2] traveled by plane from Kaysville, Utah, to Washington, D.C. to participate in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful

---

[1]      This Court has the authority to impose a split sentence. *See United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see also United States v. Sarko*, 21-cr-591 (CKK), ECF No. 337 (D.D.C. Apr. 29, 2022) (imposing split sentence).

[2]      On April 11, 2022, the Honorable Timothy J. Kelly sentenced Hardin to 30 days' home detention, 18 months' probation, 60 hours of community service, and $500 in restitution for a violation of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in a Capitol Building. *See* Case No. 1:21-cr-280 (TJK), ECF No. 44. The government had recommended a sentence of 45 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. *See id.* ECF No. 35.

transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[3]

On January 13, 2022, Buhler pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, a sentence of 30 days' imprisonment, with probation to follow, is appropriate in this case because Buhler: (1) entered and remained in the Senate Gallery, a sensitive area of the Capitol Building, just thirty minutes after Senators and the Vice President had to be evacuated from the Chamber; (2) cheered as rioters physically crushed U.S. Capitol Police ("USCP") officers at the East Rotunda Doors; (3) deleted photographs from her phone documenting her time inside the United States Capitol; and (4) ignored several red flags upon entering the Capitol Building, including the sounds of flashbangs being detonated, the plumes of smoke clouding the West Front of the Capitol Building, rioters climbing the scaffolding and tearing down the white tarp covering the northwest staircase, and shards of glass scattered on the ground outside the Senate Wing Door.

As the government has stressed in other sentencings arising out of the events of January 6, Buhler's conduct took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for her actions alongside so many others, the riot likely would have failed to disrupt the certification vote.  Here, Buhler's participation in a riot that actually succeeded in halting the Congressional certification, coupled with her entry into the Senate Gallery after celebrating the violence perpetrated against

---

[3]    As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

police officers during the breach of the East Rotunda doors, renders a 30-day term of incarceration both necessary and appropriate in this case.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF No. 25 (Statement of Offense), ¶¶ 1-7.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.  With that backdrop we turn to Buhler's conduct and behavior on January 6.

### *Buhler's Role in the January 6, 2021 Attack on the Capitol*

Buhler and Hardin flew from Utah to Washington, D.C. on January 5, 2021.   In a post-plea interview, Buhler claimed to have learned about the rally through social media.  Buhler wanted to attend the rally because she had questions and concerns about the validity of the 2020 Presidential election.  She further claimed in her post-plea interview that she believed traveling to the rally with her stepson-in-law would help her curry favor with some of her stepchildren.

Buhler and Hardin attended the rally at the Ellipse the morning of January 6.  Buhler could only partially hear the speeches at the rally because the line to enter the cordoned off stage areas was too long.  Buhler further claimed that she wanted to meet up with the First Harvest Ministries[4] group at the rally, but that Hardin was not interested and prevented her from doing so.

Buhler and Hardin stayed for only part of President Trump's speech before leaving the Ellipse and walking toward the U.S. Capitol.  Buhler and Hardin approached the Capitol from the Pennsylvania Avenue Walkway, which connects the Peace Circle to the west front of the Capitol.

---

[4] *See* https://firstharvestministries.org/ (last accessed May 3, 2022).

Buhler and Hardin followed the walkway toward the marble stairs on the northwest side of the Capitol.

Upon arriving on Capitol Grounds, Buhler could hear loud flashbangs and see plumes of smoke wafting through the air.  From her vantage point at the base of the northwest staircase, Buhler could also see rioters scaling the metal scaffolding that had been erected over half the staircase.  Buhler later witnessed some of these same rioters ripping and tearing down the plastic tarp draped over the scaffolding.  Buhler does not recall smelling tear gas, but she does recall hearing rioters clashing with police.  Specifically, Buhler remembers watching a group of rioters push past a line of officers, clad in bright yellow vests, at the top of the northwest stairs.  After observing rioters overrun these officers, Buhler, together with Hardin, ascended the marble staircase to the Upper West Terrace.  There, she could hear rioters chanting, "Stop the Steal," "Our House," and other chants in support of then President Trump.  According to Buhler, once she and Hardin reached the Upper West Terrace, Hardin informed her that he wanted to go inside the building.  Buhler claimed that while she did not personally want to enter the building, she chose to enter with Hardin because she did not want the two of them to become separated.

As Buhler approached the Senate Wing door on the northwest side of the Capitol, she could see shards of glass on the ground.  She and Hardin entered the Senate Wing Door at approximately 2:25 p.m. – twelve minutes after rioters wielding weapons and stolen riot shields shattered the windows and climbed inside the building.  Alarms were also blaring by the time Buhler entered the Senate Wing Door.[5]  As depicted in the surveillance screenshot below, rioters were still climbing through broken windows at the time that Buhler entered the building.

---

[5]      *See* https://d2hxwnssq7ss7g.cloudfront.net/s8XNlAskWNvi_cvt.mp4 (open-source video showing that alarms were blaring starting at approximately 2:15 p.m.).



*Figure 1: Rioters climbing through broken windows as Buhler (circled in red) enters the Senate Wing Door.*

During her post-plea interview, Buhler claimed that she saw a security officer standing inside the entryway of the Senate Wing Door.  She corrected her statement, however, after being shown the surveillance footage in Figure 1, which shows no officers standing inside the entryway of the Senate Wing Door.  Buhler later clarified that the officer she claimed to have seen was standing in another hallway further inside the Capitol.

Buhler and Hardin then made their way to the Crypt, where Buhler took the below photo of Hardin posing next to a bust of Abraham Lincoln.



*Figure 2: A photo that Buhler took of Hardin posing next to a bust of Abraham Lincoln inside the Crypt.*

Buhler was asked during her post-arrest interview whether she had taken any photographs on her personal phone while inside the Crypt.  Buhler confirmed that she had.  When confronted about why law enforcement was not able to find any such photographs on her phone, Buhler claimed that she deleted the photographs from the Capitol because she felt they were "unflattering" and she didn't like the way she looked in the photographs.

Buhler and Hardin spent approximately six minutes inside the Crypt before going upstairs to the Rotunda.  They walked through the Rotunda and exited into the East Rotunda lobby.  There, they stood next to a marble pillar and watched for three minutes as rioters violently assaulted and physically crushed USCP officers who were guarding both sides of the East Rotunda doors.  *See* Exhibits 1-4.[6]  Video footage of this violent breach shows that alarms were blaring as rioters

---

[6]     Exhibits 1 through 3 are clips of U.S. Capitol Police surveillance footage depicting the breach of the East Rotunda doors.  Exhibit 4 is a video obtained from defendant Ronald Sandlin's computer pursuant to a search warrant.  *See United States v. Ronald Sandlin et al.*, 1:21-cr-88 (DLF).  These exhibits will be filed with the Court in advance of sentencing.

Open-source videos also captured several different vantage points of the breach of the East Rotunda doors.  *See, e.g.*, https://d2hxwnssq7ss7g.cloudfront.net/tXIzFNM5yp9f_cvt.mp4 (Aerial

approached the USCP officers at the doors.  *See* Exhibit 4.  The windowpanes of the doors were shattered, the officers looked panicked, and the rioters were shouting, "Get out the way," "1776," "Our House," "Push," and "Your life is not worth it.  You're going to die.  Get out the way."[7]  *Id.*

As seen in the surveillance footage, Buhler and Hardin began to cheer and clap the moment the rioters breached the East Rotunda Doors.  *See* Exhibits 1 & 2.  During her post-arrest interview, Buhler claimed that she could not see what was happening at the door because the rioters standing in front of her were obstructing her view.  She offered no explanation for why she happened to start applauding the moment that rioters breached the doors.

---

view of rioters pushing past officers after the doors are breached.); https://www.youtube.com/watch?app=desktop&v=MVullQb-Lec (Footage of the exterior breach of the East Rotunda Doors.  Rioters can be seen spraying officers with chemical irritants and striking officers with flag poles and other objects.); https://twitter.com/ParlerVideos/status/1381212386338672641 (Additional footage showing the external breach of the East Rotunda Doors.  Rioters appear to be shouting "heave" as they forcibly shove the officers.); https://twitter.com/ParlerVideos/status/1381212418278318083 (Rioters begin pouring into the Capitol Building after the East Rotunda doors are breached.  Hardin is visible standing next to the marble pillar at the 00:30 time stamp of the video.).

[7]    While Buhler and Hardin may not have heard everything being said by the rioters at the door, they would have, at the very least, heard the alarms blaring and the rioters chanting, "Push," "Our House," and "1776."



*Figure 3: Screenshot from Exhibit 1, showing Buhler and Hardin clapping and cheering as rioters breached the East Rotunda Doors.*



*Figure 4: Screenshot from Exhibit 2, showing Buhler and Hardin (circled in red) witnessing the violent breach of the East Rotunda doors.*



*Figure 5: Screenshot from Exhibit 3, showing officers being crushed as rioters force open the East Rotunda Doors. Buhler and Hardin, who are not visible in this photograph, were standing just behind the pillar on the left.*



*Figure 6: Open-source photograph of the breach of the East Rotunda Doors.*

Once the doors had been breached, and as the alarms continued to blare, hundreds of rioters poured into the building and past USCP officers, who were pinned against the door.

9



*Figure 7: Hardin (circled in red) and Buhler witnessed hundreds of rioters pour into the Capitol Building after the East Rotunda Doors were breached. Buhler, who was standing next to Hardin, is not visible in this photograph.*



*Figure 8: Buhler and Hardin witnessed dozens of rioters enter the Capitol Building and ascend the staircase that they too eventually ascended to get to the Senate Gallery.*

After witnessing this mob assault first-hand and at close range, Buhler and Hardin still did not leave the building.  Instead, they went upstairs to the third floor of the Capitol Building and walked through some hallways until they arrived at the doors to the Senate Gallery.  Buhler entered the Senate Gallery at approximately 2:44 p.m., and stayed there for two minutes.  As Buhler explained during her post-plea interview, upon entering the threshold to the Gallery, she immediately recognized the room to be the Senate Chamber.  She also noticed rioters walking on to the Senate Floor.  Buhler and Hardin were two of only a handful of rioters to actually enter the Senate Gallery on January 6, 2021.



*Figure 9: Hardin and Buhler (both circled in red) entering the Senate Gallery.*



*Figure 10: Buhler (indicated with a red arrow) in the Senate Gallery.*

After leaving the Senate Gallery, Hardin and Buhler walked downstairs and wandered the hallways surrounding the Senate Chamber.   In the hallways, they encountered what Buhler believed to be two police officers wearing earpieces.   Buhler recalls the officers telling her to turn around and exit through a different hallway.   Buhler claimed that she followed the officers' instructions and walked to the nearest exit.

Buhler and Hardin ultimately left the Capitol Building through the Senate Carriage Door on the east side of the Capitol at approximately 2:53 p.m.   They spent a total of 28 minutes inside the Capitol Building.

After leaving the Capitol Building, Buhler and Hardin walked around to the west side of the Capitol and headed back toward the Ellipse.   They eventually returned to their hotel, where they gathered their belongings and made their way to a different hotel closer to the airport.   Buhler and Hardin flew back to Utah on January 7.

*Buhler's Interview with the FBI*

Buhler participated in an interview with FBI agents on April 18, 2022.  Buhler began the interview by expressing remorse for her actions and for her poor judgment on January 6, 2021.  Buhler insisted that her conduct during the riot was out of character, and that she was embarrassed for having participated.  Buhler acknowledged that no one gave her permission or authorization to enter the Capitol on January 6.  She confirmed her belief that the January 6 demonstration became unlawful the moment that rioters, including herself, entered the Capitol Building.

While Buhler was generally candid during this interview, some of her explanations about her conduct strained credulity.  For example, she insisted that she deleted photographs from inside the Capitol weeks after the riot because she felt the photographs were "unflattering," even though by that point she was likely aware that several rioters had been arrested and charged for entering the Capitol Building.  She also claims to have no recollection of why she began clapping in the East Rotunda lobby, even though surveillance footage plainly shows that her clapping coincided with the violent breach of the East Rotunda Doors.

Overall, Buhler has been cooperative with law enforcement throughout the course of the investigation.  For example, after learning of Hardin's arrest on April 2, 2021, Buhler contacted the FBI that same day and expressed interest in turning herself in.  At the time of her self-surrender and arrest, Buhler gave the FBI consent to search her cell phone.  Finally, Buhler expressed an interest in entering a plea early in this case and accepted the plea shortly after it was offered.

*The Charges and Plea Agreement*

On July 28, 2021, a complaint was filed charging Buhler with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(B), (D), and (G).  ECF No. 1.  A five-count information was filed on August 5, 2021.  ECF No. 6.  On January 13, 2022, Buhler pleaded guilty to Count Five of the Information, charging her with violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in a Capitol Building.  By plea agreement, Buhler agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Buhler now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, Buhler faces up to six months of imprisonment and a fine of up to $5,000.  Buhler must also pay restitution under the terms of her plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it.  18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).  In this case, as described below, the Section 3553(a) factors weigh in favor of a short term of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 was a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on her individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  As rioters entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while looking at Buhler's individual conduct, this Court, in determining a fair and just sentence on a spectrum of aggravating and mitigating factors, should look to a number of critical factors, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition.  While these factors are neither exhaustive nor dispositive, they help to place each defendant on a spectrum as to her fair and just punishment.

15

To be clear, had Buhler personally engaged in violence or destruction, she would be facing additional charges and penalties associated with that conduct.  The absence of violent or destructive acts on Buhler's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish her from most other misdemeanor defendants.

As Buhler acknowledged during her post-plea interview, there were several red flags that she deliberately ignored before and upon entering the U.S. Capitol Building on January 6.  Even if she did not see any bike rack barriers or "Area Closed" signs as she stepped foot on the restricted grounds, she did hear loud flashbangs and saw clouds of smoke wafting through the air—both clear signs that she was not supposed to be there.  She also acknowledged seeing rioters scaling the scaffolding and tearing down the white plastic covering—further confirmation that she should not have been on the grounds.  Before ascending the northwest staircase to the Upper West Terrace, she saw rioters overrun the police, who were stationed at the top of the staircase wearing neon yellow vests.  And, upon entering the Senate Wing Door, she could see broken shards of glass strewn across the ground.  In sum, nothing about the situation on the grounds—not the rioters scaling the scaffolding, not the flashbang grenades being detonated, not the sounds of rioters clashing with law enforcement on the West Terrace, and not the broken glass on the ground—would have suggested to any law-abiding citizen that she should keep moving toward the Capitol.

As Buhler progressed through the Capitol, she witnessed rioters engaged in serious acts of violence and destruction.  In particular, she witnessed rioters physically envelop and crush USCP officers stationed at the East Rotunda doors.  Her reaction to this violence was not to leave or find the closest exit; it was to cheer and applaud.  And despite what she claims about her vision being obscured by other rioters standing in her way, Exhibits 1 through 4 suggest that Buhler would have known exactly what was happening at that moment, especially since rioters were screaming "Push"

16

and "Get out the way" at officers.  Put simply, it is not a mere coincidence that Buhler's applauding coincided with the moment that the East Rotunda Doors were breached and hundreds of rioters came flooding in.  It's plain, then, that Buhler, through her applause, encouraged and supported other rioters who engaged in violent and destructive acts inside the Capitol.

Buhler's eventual entry into the Senate Gallery just thirty minutes after the Senate Chamber was evacuated distinguishes her from the majority of misdemeanor defendants who did not enter sensitive areas of the Capitol on January 6.  A defendant's entry into the Senate Gallery places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda, because it means that defendant took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people.  That person's presence is even more disruptive than the average misdemeanor rioter.  Physically occupying the Senate Gallery poses a greater threat and creates a greater impediment to members of Congress just trying to do their jobs than would a trespasser passing through a hallway.

Finally, the deletion of potential evidence from Buhler's phone in the days or weeks after the riot is an aggravating factor in this case.  By that point, Buhler would have known that rioters were being charged and arrested for entering the Capitol Building.  Further, as she conceded during her post-plea interview, Buhler knew her conduct was illegal the moment she crossed the threshold into the building on January 6.  Thus, notwithstanding her implausible explanation that she believed the photographs were "unflattering," Buhler did delete evidence of her participation in the January 6 riot.

Accordingly, the nature and the circumstances of this offense establish the need for a short term of incarceration in this case.

### B.  Buhler's History and Characteristics

As set forth in the Presentence Investigation Report ("PSR"), Buhler has no criminal history.  PSR ¶¶ 35-36.  She has three biological children and several stepchildren.  *Id.* ¶¶ 51-52.  Buhler is active in her community.  She teaches violin and piano, and she also volunteers with a charity project called "Turtle," which makes vests for the homeless.  *Id.* ¶¶ 55, 84.  Due to the instant offense conduct, she was fired from her post as an adjunct professor at Salt Lake Community College, where she taught classes in Fashion Illustration, Fashion Design, and Tailoring, among other things.  *Id.* ¶¶ 56, 85.  Buhler is still employed as a violin and piano teacher.  *Id.* ¶ 84.  She also owns her own clothing line.  *Id.*

Buhler has not, to the government's knowledge, posted in public forums about her participation in the January 6 riot.  During her post-plea interview, she indicated that she had sent private messages on Facebook to her brother-in-law about going inside the Capitol.  She told the FBI, however, that she was unable to access these messages because after January 6, her account had been deactivated by Facebook.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[8]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the

---

[8]     Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed.  When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.  The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.  It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry.  Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society.  Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence.  This was not a protest. *See United States v. Paul Hodgkins, 21-cr-188-RDM*, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

While Buhler is remorseful for her conduct on January 6, her failure to appreciate the wrongfulness of her conduct at the time she entered the Capitol Building—even after witnessing numerous clashes between rioters and police, and after hearing flashbangs and seeing smoke in the air and broken glass on the ground—suggests the need for some specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with

Congress.[9]  Each offender must be sentenced based on her individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[10]  *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment.  Those who trespassed,

---

[9]      Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[10]      Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097 (PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165 (TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365 (DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Buhler has pleaded guilty to Count Five of the Information, charging her with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he or she remained inside, the nature of any statements he or she made (on social media or otherwise), whether he or she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct," but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge

can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and the large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court should consider the government's sentencing recommendation in Hardin's case, since Hardin and Buhler walked through the Capitol and engaged in nearly identical conduct on January 6. For Hardin, the government recommended a sentence of 45 days' imprisonment, 36 months' probation, 60 hours of community service, and $500 in restitution. *See United States v. Hardin*, Case No. 1:21-cr-280 (TJK), ECF No. 35. The

government's recommendation for Hardin is 15 days longer than the recommendation for Buhler, in part because Hardin's background as a retired Salt Lake City police officer means that he, especially, should have known better than to enter the Capitol Building and to cheer rioters on as they violently crushed police officers at the East Rotunda Doors.

The Court may also consider the sentences imposed on rioters who entered or continued walking through the Capitol Building even after witnessing brutal violence against police officers. For example, Frank Scavo (Case No. 1:21-cr-254 (RCL)), like Buhler, witnessed the violent breach of the East Rotunda Doors.  He stood outside the building, a couple feet away from the front lines, and witnessed rioters in front of him physically assault officers, including by spraying chemical irritants in their faces.  He witnessed the same destructive crush of police as Buhler did.  And, like Buhler, this violence did not deter Scavo, who ultimately ascended the same staircase as Buhler did to reach the third floor of the Capitol Building.  On November 22, 2021, Judge Lamberth sentenced Scavo to 60 days' imprisonment and a $5,000 fine for violating 40 U.S.C. § 5104(e)(2)(G).  Similarly, Michael Joseph Rusyn (Case No. 1:21-cr-00303 (ABJ)), witnessed the violent breach of the East Rotunda Doors from outside the building.  After witnessing this violent breach, Rusyn continued inside the Capitol, through the East Rotunda Doors, into the Rotunda and eventually Statuary Hall.  There, he witnessed the breach of a police line inside the hallway connecting Statuary Hall to the main entrance of the House of Representatives chamber. The government recommended a sentence of 45 days' imprisonment and $500 in restitution for Rusyn.  On January 11, 2022, Judge Jackson sentenced Rusyn to 60 days' home detention, 24 months' probation, and $500 in restitution for violating 40 U.S.C. § 5104(e)(2)(G).

The Court may further consider the sentences imposed on Anthony Mariotto (Case No. 1:21-cr-94 (RBW)) and James Little (Case No. 1:21-cr-315 (RCL)), both of whom entered the

24

Senate Gallery.  Prior to entering the Capitol Building, both Mariotto and Little smelled tear gas and witnessed rioters clashing with law enforcement on the Capitol Grounds.  Mariotto, like Buhler, entered through the Senate Wing Door and observed the mob assault of USCP officers at the East Rotunda Doors.  Both Little and Mariotto pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G).  For Little, the government recommended a sentence of one month incarceration, 36 months' probation, and $500 in restitution.  For Mariotto, the government recommended a sentence of four months' incarceration, 36 months' probation, and $500 in restitution.  Little was sentenced by Judge Lamberth on March 14, 2022 to 60 days' incarceration and 36 months' probation.  *See* Case No. 1:21-cr-315 (RCL), ECF No. 48.  Mariotto was sentenced by Judge Walton on December 28, 2021 to 36 months' probation.  *See* Case No. 1:21-cr-94 (RBW), ECF No. 39.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."  *Id*. at 1095.

## V.        Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence.  Balancing these factors, the government recommends that this Court sentence Buhler to 30 days' imprisonment, 36 months' probation, 60 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her remorse and her early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


By:     */s/ Hava Mirell*
        HAVA ARIN LEVENSON MIRELL
        CA Bar No. 311098
        Assistant United States Attorney - Detailee
        U.S. Attorney's Office
        555 4th Street, N.W.,
        Washington, D.C.  20530
        Office: 213-894-0717
        E-mail: Hava.Mirell@usdoj.gov