**UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
COLUMBIA**

**UNITED STATES OF AMERICA,**

Plaintiff                 **:**

                      **:**       **Case No. 1:21-cr-00510 (CKK)**

        **v.**             **:**

                      **:**

**JANET WEST BUHLER,**          **:**

                      **:**

Defendant**.**               **:**

## <u>DEFENDANT'S  SENTENCING  MEMORANDUM</u>

Janet West Buhler, by and through her attorney, Brett L. Tolman, respectfully submits the following Sentencing Memorandum in support of her position at sentencing, currently scheduled for June 1, 2022.

On January 13, 2022, Mrs. Buhler entered a plea of guilty to Count 5, Parading in a Capitol Building, a Class B Misdemeanor in violation of 40 U.S.C. §5104(e)(2)(G) due to her participation in the events at the United States Capitol building on January 6, 2021.

The single count of conviction does not trigger application of the sentencing guidelines, and therefore, the following memorandum will focus on general considerations at sentencing and the application of factors pursuant to U.S.C. § 3553(a). In light of such factors and the specific application of them to Mrs. Buhler's circumstances, including her lack of criminal history, extreme regret over her actions on January 6, 2021, and the impacts to her family, employment, health and community service should she be incarcerated, counsel respectfully asks this Court to impose a sentence that does not include a requirement of incarceration, as the Court is possessed of sufficient alternatives to confinement to impose a sentence sufficient but

1

not greater than necessary to meet the ends of justice.

## POSITION ON SENTENCING FACTORS

Section 3553 of Title 18 of the United States Code sets forth certain factors a district court is to consider when sentencing a defendant who has been convicted of a federal offense. The court must consider the nature and circumstance of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. §3553(a)(1). The court shall consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* at § 3553(a)(2) (A-D).

A sentence must be "sufficient but not greater than necessary[.]" 18 U.S.C. § 3553(a). As noted in *Gall v. United States*, 552 U.S. 38, 50 (2007), the sentencing court "must make an individualized assessment based on the facts presented."

### *The Nature and Circumstance of the Offense*

Mrs. Buhler's offense of conviction was a serious one, and she deeply regrets her actions on January 6. But the government has acknowledged that Mrs. Buhler never committed property damage, vandalism, or physically assaulted anyone. Given these facts, the Probation Office has determined that a term of incarceration is unnecessary in light of all the relevant factors.

Janet is always seeking ways to engage with her three children, some of whom she helps a great deal, as well as her stepchildren and their spouses. So when Janet's step son-in-law

Michael Hardin[1] indicated to her that he wanted to attend the "Stop the Steal" rally in Washington, DC and invited Mrs. Buhler to go with him, Janet expressed interest in attending. Janet's reasons for attending were to hear then-President Trump's speech, to see DC for the first time, and to spend time with her son-in-law in an effort to strengthen family relationships.

On January 5, 2021, Janet and Mr. Hardin flew to Washington, DC, with the intention of listening to President Trump speak the next day, January 6, 2021.  The evening of January 5, Mrs. Buhler and Mr. Hardin walked around the city, ate dinner and went to bed.

On the morning of January 6, Mrs. Buhler and Mr. Hardin made their way to the site of President Trump's speech.  Rather than taking off small backpacks they were each carrying, they chose not to enter the formal grounds of the rally, and therefore watched the rally from outside.

After listening to a couple of other speakers, Janet and Mr. Hardin listened to President Trump's speech and like many, were moved by what they heard.  As encouraged by President Trump, many in the crowd began moving towards the United States Capitol.  Janet and Mr. Hardin began following others down Constitution Avenue, making small talk with others as they walked.

Mrs. Buhler and Mr. Hardin were certainly  wrapped up in the moment and continued to follow the herd mentality surrounding them as they began to move onto the grounds of the Capitol.  Mrs. Buhler does not recall seeing any acts of violence as they approached the Capitol. Janet and Mr. Hardin then ascended the steps to the Terrace area.

---

[1] Mr. Hardin was charged with the same offenses as Mrs. Buhler as the two were  side by side the entire day of January 6, 2021, including their time in the Capitol.

As the two approached the Senate wing of the Capitol, they noticed that windows had been broken and that people were streaming into the building. Janet did not feel comfortable entering the Capitol building at that time, but she also did not feel comfortable staying outside with the crowd while her son-in-law entered the building alone.

Janet chose to go into the Capitol with Mr. Hardin. The two entered the Capitol through a Senate wing doorway at approximately 2:25 p.m. and followed people to the right, thus beginning their unlawful trespass through various areas of the Capitol. Janet and Mr. Hardin did their best to stay away from groups of people, often stopping to look at exhibits and information placards. Unfortunately, some of their observations included the forcible entry of rioters through the East Rotunda doors that were being manned by Capitol Police officers. Mrs. Buhler is observed on video to cheer when rioters appear to have forced their way through the East Rotunda doors – an action that she deeply regrets to this day.

As shown in photos and video, the two eventually found themselves upstairs near the doorways to the balcony or Senate gallery (not to be confused with the Senate floor), where they can be seen entering for roughly two minutes where they looked around and took some pictures. After exiting the gallery, they walked along with others until they were ultimately informed by police officers of how and where to exit, and they proceeded to do so from the East entrance.

It should be noted that Mrs. Buhler and Mr. Hardin did not damage any property or remove any barrier to gain entry into the Capitol. They did not damage any property while inside, nor did they take any property or commit any acts of violence against any person. Mrs. Buhler did not engage in any chanting or protest. She did not observe additional violence or property destruction while inside the Capitol other than the East doors mentioned above, nor did she and

Mr. Hardin observe such after they exited the building.

Upon exiting the Capitol, Mr. Hardin and Mrs. Buhler walked back to their hotel.  They took an Uber to a hotel closer to the airport, and the next morning made their way back home.

At no time prior to the January 6 riot, nor since, has Janet glorified any sort of political unrest, nor does she believe that she was merely a tourist that day.  Janet is extremely regretful of her actions and participation in something so toxic and damaging to our country, which she loves dearly, and has and continues to accept full responsibility for her role in the events of the day.  Her participation, however limited, has been a major mark on her otherwise exemplary character and life, and the consequences for her have already been far-reaching.

### Janet Buhler's History and Characteristics

Janet Buhler's conduct on January 6 was a momentary and deeply regretted divergence from a law-abiding life that has always been focused on service to her family and community. Janet, with the exception of a few short years, has been a lifelong resident of Utah. She was born in Murray, Utah on May 4, 1964, and describes herself as having had a rather normal childhood, living with her parents and five siblings at the top of a mountain, where her family was fairly secluded from other families and peers, but overall maintained a relatively pleasant existence despite pressures from being reared in a strict household where she was pushed to be her best and care for her younger siblings.

When Janet was 18 years old, she moved to Provo, Utah, for college.  A few years later, in 1985, she married her first husband, Michael Anderson, and moved to Salt Lake City, Utah. Janet and Michael had three children together, with a fourth child that passed away at birth, and ultimately got divorced in 2004.  Janet worked several jobs to take care of her children after the

divorce, as her ex-husband would "pick and choose" what he would pay for.

In 2005, Janet married her current husband, Craig Buhler.  Janet and Craig have been together since 2005, and currently reside in Kaysville, Utah.  Janet and Craig have no children together, but Craig has six daughters and four stepsons from a previous marriage.

In one of many character reference letters attached hereto, Janet's son, Blake Anderson, described that without the assistance of his mother, he may not be here today.  He describes, "Unfortunately, I began using illicit drugs, and the last ten years I have put my mother through untold worry and stress. She has spent so much money and time for several treatment programs and has not given up on me like my father and many others. I am finally on the path to recovery, and my mother takes time out of her schedule to attend family support meetings. Because of the recent events, my mom has lost almost half of her income and most of her remaining income these days goes to help me with my rehab, medication and rent, etc. It is a critical time in my recovery, and I need her continued and uninterrupted financial and emotional support. I need her. We all do."

Despite dealing with many difficult situations thrown her way over the years, Janet Buhler has lived an exemplary life.  She has won five national gold medals in Taekwondo, is currently one credit away from a Piano Performance degree from the University of Utah (she already has a bachelor's degree from Brigham Young University as well), and from 2013-2020, attended annual trainings in Haute Couture techniques at Lesage in Paris in order to advance her fashion credentials.  She also is an expert seamstress and award-winning needlework artist and has studied these arts in London and Italy.  Janet is also an extremely talented piano and violin teacher, helping many students across a broad age range to be their best.  She also owns her own clothing line, "Anna Rewick," which she sells online.

Amy Bouck characterized Mrs. Buhler as a "very positive person [who] is willing to help in any way she can. She has been a positive influence in all four of my children's lives [and] is extremely encouraging. [Janet] has always provided a positive environment for learning and developing individuals…in order for them to achieve their full potential. [Overall], she has helped my children overcome anxieties and fears by being a consistent person in their lives."

Along with her dedication to furthering the musical advancement of her many students, Mrs. Buhler also donates countless hours of her time to the Turtle Shelter Project. With her experience in sewing and her superior knowledge of industry, design, and production, she has helped this non-profit donate insulated water-proof vests to thousands of members in nearby homeless communities in Colorado and Utah.

Jen Spencer, Founder and Executive Director of the Turtle Shelter Projects commented, "Our organization is a service project that produces foam insulated vests that help the members of our homeless community survive in cold weather…. We make these by hand using volunteers' sewing and production skills in our community. Last year alone, we were able to produce 1,000 vests to distribute to our homeless community along the Wasatch front and in Colorado. We rely heavily on the skills of volunteers with advanced sewing skills to meet our goal each year… From day one, Janet has been such an incredible answer to my prayers and has become quite an asset to this project and our production team. She has such a huge heart, cares so much about helping others, and is really easy to get along with.  Janet also has a passion for teaching and has been willing to come to many of our service events to teach people our process and supervise quality control. That I want to stress how important Janet is to our organization."

When asked about Janet Buhler, former Davis County Sherriff Todd Richardson, said,

"I have served for twenty-three years and in that time, I have known Janet, and her family for over 20 years. Through those years I have seen many cases where she has contributed time and energy to differing causes to improve the safety and security of the community. Thus, as a law enforcement leader in Davis County, I have only had positive interactions with Janet. She is well known for being pro law and pro law enforcement. My interactions with Janet on a personal level have also all been positive. She is thoughtful and direct and, in my experience, has repeatedly shown respect for the law."

Despite contributing so much and having the love and support of so many in her community, Janet's participation in the January 6 riots and the subsequent press stories about it have led to many serious consequences for her in terms of employment and health-related issues from stress.

Janet lost her job with the Fashion Institute Program at the Sale Lake Community College, where she served as an adjunct professor in Fashion Illustration, Fashion Design, Tailoring, Couture Embellishment, Collection Development, Sewing Techniques and Patternmaking. As her former colleague, Barbara Jensen notes, "Janet [was] an irreplaceable member of the faculty. Her knowledge of sewing and patternmaking is unparalleled. The students will suffer the greatest loss from her absence."

In addition to international trainings Janet would attend at her own expense to better her craft and help her students, Ms. Jensen notes, "[w]hen students couldn't afford supplies for the classes, she often donated tools and materials to help them. One semester, a student needed extra help outside of class, and Janet tutored her one on one every week for the entire semester without compensation. Another student was preparing for the final show and his wife had a baby that week. Janet made two of the shirts he needed to finish his collection the night before

the show. Janet was always encouraging to the students and accepting to all genders and orientations."

Due to her poor decision-making in entering the Capitol on January 6, Mrs. Buhler has also been suffering physically. Janet has recently undergone medical testing for gall bladder issues, GERD (gastroesophageal reflux disease), GI distress and stress management. Mrs. Buhler previously suffered from some of these issues since her divorce in 2004, but for roughly the last year and a half since the riot, she has been suffering daily with these conditions, with pain in the gallbladder, abdominal pain, gas, bloating and frequent diarrhea. She has also had irregularities in her most recent labs, and wakes up several times a night thinking about her actions and the associated consequences, both for her and what the events have done to further the political divide across the country. Janet has also lost friends, students, and standing in the community when people discovered she was in the Capitol on January 6, which has been heartbreaking for her.

### *Seriousness of the Offense*

While the events of January 6, 2021 will long serve as a scar on our country and Janet personally, the government concedes that Janet committed no violent acts and destroyed no property while at the Capitol. As visible on the Closed Captioning TV (CCTV) and other images captured at the Capitol that day, Janet and Mr. Hardin were not destructive or inciteful, and stood back during the one instance of violence and destruction that they witnessed, the unfortunate breaking of the East Rotunda doors.

In the Sentencing Recommendation submitted by Chief United States Probation Officer Brian Shaffer by Robert Walters on Janet's case, he acknowledged that the "recommended term of 36 months (three years) probation is sufficient to address the goals of sentencing." He made

this recommendation after duly "considering the nature and circumstances of the offense and to reflect the seriousness of the conduct." Shaffer also noted that "Buhler has no criminal history and no instances of violence," and that given her previously blameless life and lack of criminal history, "a probationary sentence would serve to act as deterrence from any future criminal activity and fulfill the goals of punishment."

As alluded to previously, Mrs. Buhler did not have a preconceived motive in the Capitol that day. She has never associated with the Proud Boys or any other group spurring on violence and rhetoric that day. She attended a rally with a family member, got caught up in a moment of high drama, and made the unfortunate decision to follow along with an incited crowd. This led her to make a not-insignificant criminal trespassing mistake that she has, and will forever, regret. It is truly inconceivable to Mrs. Buhler and those who know her that she could have made such errors and acted with such lack of judgement that day, marring a life otherwise marked by grace and kindness.

However, while the unfortunate events at the U.S. Capitol on January 6, 2021 were certainly unprecedented, the legal norms for sentencing individuals based on individual conduct are not. For example, the Government in its sentencing memorandum suggests that this Court consider certain factors when looking at Janet's individual conduct in determining a fair and just sentence on a spectrum of aggravating and mitigating factors. Each of these factors supports the Probation Officer's recommendation of a probationary sentence:

(1) *Whether, when, and how the defendant entered the Capitol building.*

   Janet entered the US Capitol with Mr. Hardin at approximately 2:25 p.m. on January 6, 2021 through the East Rotunda doors, which were open at their time of entry.

(2) *Whether the defendant encouraged violence.*

At no time before, during or after the riot did Janet encourage any type of violence.

(3) *Whether the defendant encouraged property destruction.*

At no time did Janet participate in or encourage property destruction.

(4) *The defendant's reaction to acts of violence or destruction.*

As visible on CCTV, Janet does cheer coinciding with the East Rotunda doors being forced open by the mob. However, Janet remained standing in the background and has frequently expressed her dismay at her action in that moment.

(5) *Whether during or after the riot, the defendant destroyed evidence.*

Janet had two photos that were taken inside the Capitol that she deleted on her phone, as she frequently does while going through her phone.

(6) *The length of the defendant's time inside of the building, and exactly where the defendant traveled.*

Janet and Mr. Hardin were in the Capitol for approximately 28 minutes. They briefly traveled to the Senate Gallery and took a couple of photos, and were also in the area of the Capitol known as the crypt.

(7) *The defendant's statements in person or on social media.*

Janet did not post statements regarding the Capitol riot on social media at any time before, during or after January 6. Janet believes she may have sent one private message to a family member on Facebook while at the Capitol, but is unable to confirm due to her Facebook account being suspended.

(8) *Whether the defendant cooperated with, or ignored commands from law enforcement officials.*

Janet and Mr. Hardin exited the capitol when asked to do so by Capitol Police.  Upon

learning about the FBI wanting to talk to Mr. Hardin, Janet immediately contacted

authorities and cooperated with the investigation.

(9) *Whether the defendant demonstrated sincere remorse or contrition.*

Janet has stated that participating in this event has been the biggest mistake of her life and

that if she could take it back and never travel to Washington, DC, she would. Those who

have interviewed Janet, including the AUSA, the FBI Investigator, the Pre-Trial Services

Investigator, and the Jan. 6 Commission investigator have each acknowledged Janet's

sincere remorse and acceptance of responsibility for her actions that day.

Given Janet's lack of destructive behavior, posting on social media and regret for her actions,

a fair and just punishment can easily be reached without incarceration and consistent with other

similarly situated defendants, including Mr. Hardin, who is effectively her co-defendant, who

was recently sentenced to home detention and supervision but no jail time.

### *Promote Respect for the Law and Provide Just Punishment*

Janet is a person with great regard for the law, who, aside from an occasional speeding

ticket over the years, has never before been in any sort of trouble with the law.  Additionally,

the stress, grief and emotional and physical turmoil Janet has gone through because of her

participation at the Capitol that day is more than enough to dissuade her from any further

participation in *anything* unlawful in the future.  Her chance of recidivism is effectively zero.

In discussing just punishment, incarceration would not serve Janet or the larger good.

As briefly noted above, Mr. Hardin was sentenced on April 11, 2022.  Michael Hardin was

sentenced by the Honorable Timothy J. Kelly to 30 days' home detention, 18 months'

probation, 60 hours of community service, and $500 in restitution for a violation of 40 U.S.C. §

12

5104(e)(2)(G): Parading, Demonstrating, or Picketing in a Capitol Building. *See* Case No. 1:21-cr-280 (TJK), ECF No. 44.  The government had recommended a sentence of 45 days incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. *See id.* ECF No. 35.

    If this court were to impose a sentence greater than a short period of home detention or a probationary term, community service and restitution, it would create an unwarranted sentencing disparity compared to (1) the identical, in every factual and legal way, case of Mr. Hardin decided by another judge in the very same court, and 2) other similar cases that have already been sentenced in the same district court.  The following cases, where a misdemeanor was charged and pled to, resulted in no incarceration:

- *United States v. Danielle Doyle,* 1:21-cr-00324 (TNM) (October 1, 2021) Defendant sentenced to probation even though she entered through a broken window and yelled at police officers;

- *United States v. Jordan Kenneth Stotts,* 1:21-cr-272 (TJK) (Nov. 9, 2021) Defendant sentenced to probation even though he posted on social media "It all started by scaling a wall as we broke into the U.S. Capitol [sic] to strike fear into the sold-out Congress." He also posted a photo with the following comment, "Patriots! I got kicked out, but I'll be back!";

- *United States v. Lori Vinson* 1: 21-cr-355 (RBW) (10-22-2021) Defendant sentenced to probation even though she told local news authorities that she believed her actions were "justified" and that she would "do this all over again tomorrow.";

- *United States v. Samuel Christopher Fox,* 1:21-cr-00435 (BAH) Defendant sentenced to home detention for 60 days and probation even though the government alleges he posted

on Facebook his plans to go to D.C. and posted "the next time I see fireworks go off in DC [sic] I want them attached to a traitor [sic] politicians."

- *United States v. Andrew Bennett,* 1:21-cr-00227(JEB) Defendant sentenced to three months home confinement and 2 years' probation.  In this case, the government recommend probation with a short term of home confinement even though Mr. Bennett was an admirer of the Proud Boys but not a member, bragged about his conduct that day and espoused conspiracy theories about the election.  According to the government, Mr. Bennett planned on coming to the rally in D.C. for months; it was not a last-minute decision.  He posted to his Facebook page on January 4, 2021, "You better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for freedom!" Also on January 6, 2021, according to the government, Mr. Bennet began livestreaming to his Facebook page outside the Capitol around 1 pm.  He was in the middle of the growing crowd on the West Front of the Capitol, where some taunted police officers and sporadically threw objects at them. The government alleges that someone near Bennett also yelled at a police officer and filmed assaults on the police officers and continued to livestream events inside the building.

Given these sentencing outcomes, the distinctions the government seeks to make in this case are not tenable.  Indeed, in other cases where the Court has sentenced a misdemeanor January 6 defendant to a term of incarceration, the nature and circumstances of those offenses, as well as the history and characteristics of the defendants, are markedly different from Janet Buhler.  There is nothing materially different about Mrs. Buhler or her conduct that would justify a sentence of incarceration and such disparate treatment. The courts have sentenced some misdemeanor cases to incarceration, but the nature and circumstances of those offenses, as well

as the history and characteristics of the defendants in those cases can be distinguished from Mrs. Buhler's history and actions that day.

In *United States v. Reeder,* 1:21-cr-166 (TFH)  Mr. Reeder was sentenced to 90 days incarceration by the Honorable Judge Hogan because he boasted on social media about engaging in confrontations with law enforcement, claimed he wasn't aware that he couldn't be inside the Capitol despite being tear-gassed, recorded attacks on law enforcement inside the capitol and entered the Capitol a second time, forcing his way past law enforcement who were trying to clear the Capitol, put his hands on a police officer, boasted about his actions, deleted social media accounts and ultimately showed no remorse or accountability for his actions that day. He portrayed himself as a victim of circumstances even after pleading guilty, according to the government.

In *United States v Derek Jancart and Erik Rau,* 1:21-cr-00467, both defendants were sentenced by the Honorable Judge Boasberg to 45 days of incarceration, but unlike Janet's case, the prosecutors asked for (4) four months of incarceration for each defendant, citing the men came to D.C. with gloves, a gas mask and a two-way radios.  *Id*  Mr. Rau is heard screaming at police "We have you surrounded!" on a Facebook video post Mr. Jancart posted where Mr. Jancart can be heard laughing at police.  Mr. Rau, unlike Mrs. Buhler, was also on probation at the time of his offense on January 6th for domestic violence.

Mrs. Buhler turned herself in and has been very cooperative with law enforcement. She has also taken full responsibility for her actions that day. The facts of the offense, conduct and characteristics of the defendants who were sentenced to incarceration are vastly different from Mrs. Buhler's conduct and characteristics. The U.S. Probation sentencing recommendations are on the low end for Mrs. Buhler.

Lastly, the defense would like to point out that the government, inconsistently and before this very Court, did not recommend jail time in the case of Kenneth Kelly.  Mr. Kelly was not among the front lines of rioters who broke through the doors, however prosecutors say he was "hoisted over the wall to get into the building since the stairs were too crowded with people.  Once he was in the building, he ignored a police officer's direction to exit the building, and instead walked around for a few more minutes, texting others pictures of inside before finally leaving."

Evidence was admitted of various text messages from Mr. Kelly bragging about his exploits that day.  Specifically, evidence photos and text messages such as "Inside White House via breaking in windows!" were documented and noticed in court.  Mr. Kelly was arrested for his involvement in the Jan. 6 incident by FBI agents after a relative of his tipped them off; he did not turn himself in as Mrs. Buhler did.

Mr. Kelly plead guilty in September to one count of parading, demonstrating, or picketing in the U.S. Capitol building, the same as Mrs. Buhler.  The government had asked for 36 months of probation, including 60 days of home detention.  Mr. Kelly was ultimately sentenced to 60 days home detention and 12 months of probation as well as the constant wearing of a GPS locator and $500 restitution for damages.

The defense finds it rather inexplicable that the very same government recommended no jail in Mr. Kelly's case, which this Court granted, but now recommends jail time for Mrs. Buhler.  A ruling of jail time in this case would be entirely inconsistent in this same courtroom having sentenced Mr. Kelly to home detention and probation.

Mrs. Buhler has accepted full responsibility for her actions, turned herself in, and has been very cooperative with law enforcement.  While what happened on January 6 unfortunately cannot be undone, the facts of Janet's specific offense and conduct are vastly different from

many who have been sentenced to terms of incarceration, and frankly many whose actions warrant incarceration.  But incarceration would serve no intended purpose for Mrs. Buhler's case.

### Afford Adequate Deterrence to Criminal Conduct/Protect the Public from Further Crimes

As noted in the Government's Sentencing Memorandum (p.13) "Overall, Buhler has been cooperative with law enforcement throughout the course of the investigation. For example, after learning of Hardin's arrest on April 2, 2021, Buhler contacted the FBI that same day and expressed interest in turning herself in. At the time of her self-surrender and arrest, Buhler gave the FBI consent to search her cell phone.  Finally, Buhler expressed an interest in entering a plea early in this case and accepted the plea shortly after it was offered."

As your honor and other judges in this Court have already found probationary sentences sufficient to deter and protect the public from further crimes, it is certainly the case with Mrs. Buhler that such a sentence based upon her conduct in this case is appropriate.  Janet Buhler made serious mistakes on January 6 and participated in an event that she very much regrets having been a part of, but those who have interacted with her in this case have no concerns that she is a danger to the community or capable of further criminal conduct.  Putting Janet in jail for any amount of time does not serve the interests of society, nor is it necessary to satisfy the ends of the law in this case.

### The Need for the Sentence, and the Kind of Sentence Available

Finally, factors discussed in Application Note 3 to U.S.S.G. §5K2.20 to consider leniency for aberrant behavior include:

> In determining whether the court should depart under this policy statement, the court may consider the defendant's (A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense.

As evidenced by Janet's experiences, each of these factors support leniency for Mrs. Buhler.

Additionally, courts have also considered broader factors in light of the aberrant behavior, including:

> (1) degree of spontaneity; (2) amount of planning; (3) the singular nature of the criminal act; (4) the defendant's [lack of] criminal record; (5) letters from friends and family expressing shock at the defendant's behavior; (6) the defendant's motivations for committing the crime; (7) the level of pecuniary gain the defendant derives from the offense; (8) the defendant's charitable activities and prior good deeds; and (9) the defendant's employment history and economic support of family.

*Zecevic v. U.S. Parole Comm'n*, 163 F.3d 731, 734-35 (2d Cir. 1998). To the extent that these various factors apply in the present case, all apply as mitigating factors in favor of leniency for Mrs. Buhler.

The United States Supreme Court has also opined that non-custodial sentences can satisfy the need for deterrence and justice:

We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See *United States v. Knights,* 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001)

> ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " (quoting *Griffin v. Wisconsin,* 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)). FN4 Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.

> USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

> FN4. See also Advisory Council of Judges of National Council on Crime and

Delinquency, Guides for Sentencing 13–14 (1957) ("Probation is not granted out of a spirit of leniency ....."[T]he probation or parole conditions imposed on an individual can have a significant impact on both that person and society..... Often these conditions comprehensively regulate significant facets of their day-to-day lives.")

*Gall v. United States,* 552 U.S. 38, 48-49

**CONCLUSIONS**

The events that took place at the United States Capitol on January 6 were nothing short of gut wrenching, and will leave scars on this country for a considerable time.  But in order for our system of law to be upheld, each defendant needs to be sentenced on his or her individual conduct.  While Mrs. Buhler unmistakably made serious, even criminal, errors in judgement by entering the U.S. Capitol that day, cheering when the East Rotunda doors were forced opened, and eventually deleting a couple of pictures off of her phone, she was not destructive and did not engage in any type of violence, property destruction or the promulgation or idealization of dangerous ideas on social media or otherwise that so many other January 6 participants did.

As noted in Janet's Pre-sentence Report (PSR), (page 9, paragraph 31), "Mrs. Buhler express[ed] that this is the biggest regret of her life. … She added that if she would have known about the chaos this event would bring, she would have run the other way."

Janet Buhler is someone who strives to improve herself and the lives of those around her each day.  She does this through her own self-improvement, and by giving of her time, talents and education to all those around her.  Janet has already paid steep prices for her actions on January 6, 2021, and deserves to have a punishment that does not include prison time.

As the Supreme Court appropriately advised in *Koon v. United States,* 518 U.S. 81, 113 (1996):

It has been uniform and constant in the federal judicial tradition for the

19

> sentencing judge to consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and punishment.

Janet has no excuse for entering the Capitol building on January 6 under the circumstances in which she entered. But she has cooperated with every request and condition of the government so far. If sentenced to jail time she would stand to lose her clothing business, Anna Rewick, that she has worked so hard to build, and more importantly, would fail countless children she teaches music to who depend on her for critical development at a critical time in their lives. These losses are in addition to the other losses she has already sustained. The government has every indication to believe that Janet will continue to comply with any terms of probationary sentence if given.

Mrs. Buhler is a person of character who engaged in extremely poor decision making on a day ripe with passion and incitement. She has indicated that she deserves to be punished for her actions, but her punishment should not exceed that of her effective codefendant, Mr. Hardin, who did not receive jail time. What a glaring injustice it would be for Mrs. Buhler, a 58 year old woman, mother to many, a needed music teacher to local children, and longtime community servant, to be sentenced to a more severe sentence than her son-in-law counterpart where there is no factual or legal difference between the two other than that Mrs. Buhler was initially more cooperative than Mr. Hardin upon learning about the FBI's investigation. For the reasons asserted above, counsel for the defendant Janet Buhler respectfully requests this Court sentence Mrs. Buhler to a probationary term and appropriate fine and restitution consistent with the recommendation in the PSR.

Respectfully submitted by:

By: */s/ Brett L. Tolman*
Brett L. Tolman (UT 8821)
(Admitted Pro Hac Vice)
13827 Sprague Lane
Draper, UT 84020
801-639-9840
brett@tolmangroup.com

DELIVERY  CERTIFICATE

      I certify that a true and correct copy of the foregoing was caused to be delivered to all involved parties, by electronic filing, as well as email courtesy copy, on the 18th day of May, 2022.

*/s/ Sarah Fiedler*